UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


Washington International
Insurance Company and North
American Specialty Insurance
Company

   v.                                              Civil No. 10-cv-526-LM

Ashton Agency, Inc.


**O R D E R**

In an order dated September 10, 2012, the court granted summary judgment to plaintiffs (collectively "Washington") as to liability on their breach of contract claim against Ashton Agency, Inc. ("Ashton"), but deferred a determination of the amount of damages to which Washington is entitled. It is undisputed that Washington is entitled to $482,199.33, based upon Ashton's failure to remit premiums for Washington surety bonds it sold and never replaced. Still at issue is the amount of damages to which Washington is entitled for Ashton's failure to remit premiums on between 551 and 578 Washington bonds that Ashton later replaced with bonds issued by Great American Insurance Company ("Great American"). Before the court are: (1) Washington's motion for summary judgment; (2) Ashton's motion to strike the affidavit Washington submitted in support of its motion for summary judgment; and (3) Ashton's cross-motion for

summary judgment.  The court heard oral argument on the pending motions on March 5, 2013.  For the reasons that follow, each of those three motions is granted in part and denied in part.

Washington first argues that it is entitled to $1,024.373.84, the full amount of the unremitted premiums for the replaced bonds.  It bases that argument on: (1) the court's statement that "[t]he position that Washington bargained for was to retain as profit the difference between net premiums it took in and the claims it paid out," Order (doc. no. 75), at 7-8; and (2) the fact that it has paid out no claims on any of the replaced bonds.  That argument, however, ignores the fact that the position Washington bargained for also included remaining on the risk for the full term of the bonds which, demonstrably, it did not.  For that reason, Washington's first argument is a complete non-starter.

In the alternative, Washington argues that it suffered damages of no less than $673,141.46 as a result of Ashton's failure to remit premiums for the bonds it later replaced. Washington supports its motion with an affidavit from Kay Hull, who is employed by NAS Surety Group as its Vice President for Commercial Surety.

In a document that does double duty as a memorandum of law in support of its objection to Washington's summary-judgment motion and as a memorandum in support of its own cross-motion

for summary judgment, Ashton argues that: (1) Washington may not recover lost profits because it never asked for that form of relief in either its complaint or its first motion for summary judgment and because there is no procedural basis for interposing a request for lost profits at this stage in the litigation; (2) Washington has not provided evidence that conforms with the court's characterization of the damages to which it is entitled; (3) Washington has produced no admissible evidence to support its request for lost profits; and (4) Washington is not entitled to pro rata damages. Ashton further argues that Washington's claim for damages is both excessive and inadequate. Ashton has not, however, produced any evidence in support of its summary-judgment motion.

Ashton's first argument is a reiteration of an argument it made in its motion to reconsider the order on Washington's first motion for summary judgment. Specifically, Ashton argues that Washington is precluded from recovering any damages based upon Ashton's failure to remit premiums for the replaced bonds because Washington agreed to final resolution of this matter on a "case-stated" basis, and the only relief it sought was the full amount of the premiums it was owed. In Ashton's view, a determination that it was not liable for the full amount it failed to remit required a determination that it was not liable for any of that amount.

In its memorandum of law, Ashton relies upon an opinion that explains that a case stated is decided "on stipulated facts in lieu of trial." Lange v. Wells Fargo Bank, N.A. (In re Proctor), Bankr. No. BK09-42748-TLS, Adv. No. A09-4072-TLS, 2010 WL 3944694, at *1 (Bankr. D. Neb. Oct. 6, 2010). The lack of a set of stipulated facts in this case undermines Ashton's claim that the parties agreed to the case-stated procedural posture before Washington submitted its first summary-judgment motion and suggests, to the contrary, that Ashton injected the idea of a case-stated disposition into this case only after the court issued an order that Ashton found to be unfavorable. Beyond that, it is inaccurate to characterize Washington as pursuing a new theory of liability. From the outset, Washington has claimed that Ashton breached its agreement to remit approximately $1 million in premiums for the bonds Ashton later replaced. Washington's theories of liability included breach of contract. That theory of liability, in turn, encompasses standard contract damages, "[t]he goal of [which] is to compensate for 'actual losses suffered,'" Def.'s Obj. to Pls.' Mot. Summ. J. (doc. no. 68), at 8 (quoting McLaughlin v. Union-Leader Corp., 100 N.H. 367, 371 (1956)). If Ashton's breach of contract caused Washington to suffer actual losses in some amount less than the full amount that Ashton failed to remit, then Washington is entitled to that amount as damages. In

4

short, the court is entirely unpersuaded by Ashton's argument that Washington has litigated the issue of damages in a way that requires the court to resolve that issue on an all-or-nothing basis.

Ashton's next line of attack is its argument that Washington has failed to carry its burden of proof on damages. Before addressing the adequacy of the evidence Washington has produced, the court turns to the allocation of the burden of proof. Ordinarily, a plaintiff bears the burden of proving its damages. But, this case involves several circumstances that might call for a more nuanced application of that general principal.

First, Washington has proven that Ashton agreed to remit premiums for all the Washington bonds it sold and that as of July 15, 2010, the agreed-upon date by which Ashton was to remit those premiums, it was in breach, in the amount of $1.5 million. As noted above, the parties' dispute centers on approximately $1 million in premiums for the bonds that Ashton later replaced with bonds issued by Great American. Setting aside Ashton's argument that Washington is entitled to nothing because it only asked for the full $1 million, its fallback position is that Washington cannot prove any amount of damages less than the full $1 million. But, given Ashton's undisputed breach of its agreement to remit that $1 million, establishing an appropriate

amount of damages less than the full amount that Ashton failed to remit seems more than a little like an affirmative defense on which Ashton would bear the burden of proof.

There is another reason to question Ashton's allocation of the burden of proof.  Washington's "actual losses suffered," McLaughlin, 100 N.H. at 371, consist of the $1 million in premiums it should have received less the amount it would have paid in claims.  The amount Washington would have retained after paying claims is necessarily equal to the amount Great American will retain once its exposure to claims has abated.  In other words, the single best measure of Washington's actual loss is Great American's actual profit.  Washington, however, has no access to information about Great American's profits on the replacement bonds.  Moreover, Washington's lack of access to the best measure of its damages is entirely a result of Ashton's breaching its agreement with Washington and then deciding to replace the bonds that Washington had issued with bonds from Great American.  That set of circumstances supports the proposition that Ashton should be the party required to produce the evidence necessary to prove how much less that the $1 million it promised to remit it must pay as damages for its failure to remit that $1 million.

If, indeed, it properly falls to Ashton to prove any deduction from the $1 million it promised to remit, then, under

6

Ashton's own argument, its failure to produce any evidence on that matter would entitle Washington to the full $1 million it seeks. But, for reasons discussed above and in previous orders, both "all" and "nothing" are off the table.[1] Thus, we are back to square one: what are Washington's damages? The court has previously ruled that "Washington is entitled to . . . the profits it would have earned from the replaced bonds, an award that both puts Washington in the position it bargained for and compensates it for the ten weeks it spent on the risk without any premiums from which to pay claims."[2] Order (doc. no. 75), at 9.

In support of its claim for $673,141.64 in lost profits, Washington has submitted an affidavit from Kay Hull. Rather than producing a counter affidavit, Ashton devotes its

---

[1] With regard to "all," Washington reiterates an earlier argument that it is entitled to the full $1 million based upon the principal that once legal risk attaches to a surety bond, the premium has been earned in full and is not subject to apportionment. That principal, however, appears to apply in the context of the relationship between the purchaser and the issuer of a bond. See Smith v. Am. Sur. Co. of N.Y. (In re Parker-Young Co.), 12 F. Supp. 987 (D.N.H. 1935). That, however, is not the legal relationship that forms the basis for Washington's claims against Ashton, which renders the rule of law on which Washington relies inapposite.

[2] Based upon the foregoing language, Ashton is flatly incorrect in arguing, in Section III of its memorandum, that Washington misconstrued the court's order on summary judgment and erred by developing a record on lost profits rather than focusing on the losses it incurred as a result of being on the risk with no premiums.

attention, both in its summary-judgment memoranda and in its motion to strike, to challenging the admissibility of Hull's testimony and an exhibit attached to her affidavit. Specifically, Ashton argues that: (1) lost profits must be established by expert testimony, and Washington may not rely upon Hull's opinions because she was never disclosed as an expert; (2) Hull's opinions are unreliable; (3) Hull's opinions are inadmissible under Rule 701 of the Federal Rules of Evidence; (4) Exhibit 1 to Hull's affidavit is inadmissible hearsay; and (5) Exhibit 1 is not an admissible summary document under Rule 1006.  Washington responds by arguing that: (1) Hull's affidavit meets the requirements of Rule 56 of the Federal Rules of Civil Procedure; (2) Hull is a fact witness, not an expert; (3) expert testimony is not necessary to prove its damages; (4) Exhibit 1 to Hull's affidavit would be admissible at trial; and (5) Ashton will suffer no cognizable prejudice if the court considers Hull's entire affidavit.

Ashton's arguments concerning the Hull affidavit provide no basis for denying Washington's motion for summary judgment. Hull is a fact witness.  And, as is made clear below, the court relies upon just two facts from that affidavit, Washington's gross premiums ($8,389,334) and its actual losses ($3,533,619.68) on the Standard Florida Motor Vehicle Dealer Bonds it has issued since 1995.  As for the exhibit attached to

Hull's affidavit, the court relies upon that exhibit for nothing more than two figures that Ashton does not dispute, the net premiums that Ashton was obligated by remit to Washington by July 15, 2010, for Standard Florida Motor Vehicle Dealer Bonds ($148,958.87) and for Hard to Place Florida Motor Vehicle Dealer Bonds ($862,344).  To restate, there is nothing in Ashton's arguments concerning the Hull affidavit to preclude the court from using certain facts from that affidavit to determine Washington's damages in the manner described below.

Turning to the substantive issue, Ashton's focus on the term "lost profits" and its subsequent reliance upon the requirements for proving that form of damages elevates form over substance and fails to take into account the circumstances of this case.  This case does not involve anything nearly as speculative as: (1) the earnings that would have resulted if a failed plan for business ownership had actually come to fruition, see Fin Brand Positioning, LLC v. Take 2 Dough Prods., Inc., No. 09-cv-405-JL, 2012 WL 1416000, at *1 (D.N.H. Apr. 24, 2012); (2) the profits a subcontractor would have earned on future projects if the contractor who hired it had not breached the contract that was the basis for the subcontractor's claim against the contractor, see Indep. Mech. Contractors, Inc. v. Gordon T. Burke & Sons, Inc., 138 N.H. 110, 115-18 (1993); (3) the profit a logger would have earned from harvesting and

9

selling saw timber and firewood from a 150-acre woodlot, see Fitz v. Coutinho, 136 N.H. 721, 722-23 (1993); or (4) the profit that would have resulted from the manufacture of a line of aircraft where the plaintiff had secured neither the right to do so nor the financing necessary to secure that right, see Great Lakes Aircraft Co. v. City of Claremont, 135 N.H. 270 (1992). Rather, what is at issue here is how much Washington would have earned on the bonds that Ashton sold, where Washington had a fifteen-year history of issuing those same bonds in the same market, with Ashton as the seller.  Based upon New Hampshire law and the circumstances of this case, it is evident that in reliance upon Hull's testimony as a fact witness, this court is able to make "a reasonably certain determination of the amount of gains [to Washington that were] prevented" by Ashton's breach of contract.  Indep. Mech. Contractors, 138 N.H. at 118 (citation omitted).

   Hull's affidavit establishes the following.  Ashton replaced two different kinds of bonds, Standard Florida Motor Vehicle Dealer Bonds ("Standard bonds"), and Hard to Place Florida Motor Vehicle Dealer Bonds ("HTP bonds").  Washington began issuing Standard bonds through Ashton in 1995, and began issuing HTP bonds through Ashton in 2007.  Hull's affidavit also indicates, for each type of bond, Washington's gross premiums and its actual losses due to claims over the entire time that

10

Washington has issued each type of bond. Washington has also produced an exhibit to Hull's affidavit which lists the net premiums for each type of bond. Having described the evidence before it, the court turns to each of the two types of bonds at issue in this case.

**Standard bonds**. Since 1995, Washington has charged $8,389,334 in gross premiums for Standard bonds and has sustained $3,533,619.68 in actual losses on those bonds. Thus, on those bonds, Washington's losses amounted to 42.1 percent of the gross premiums. In this case, Ashton collected $229,167.50 in gross premiums on the Standard bonds for which it failed to remit premiums. Based upon the historical pattern of losses equaling 42.1 percent of gross premiums,[3] Washington stood to pay out $96,526.23 in claims on the Standard bonds at issue. Subtracting that figure from the $148,958.87 in net premiums that Ashton should have remitted to Washington, it is reasonable to expect that Washington would have made a profit of $52,432.64 on the Standard bonds for which Ashton failed to remit premiums, if the 42.1 percent loss ratio is reliable.

As the court noted in a previous order, given the nature of the bonds in this case ("occurrence" rather than "claims made"),

---

[3] While the 42.1 percent loss ratio appears in the exhibit to which Ashton objects, it may be derived from the figures related in Hull's affidavit, which makes the admissibility of the exhibit irrelevant as to the loss ratio.

Washington remains on the risk with regard to some of the bonds used to calculate historical loss ratios, i.e., those issued less than six years ago.  But, because Washington has been issuing Standard bonds 1995, the fact that it is still subject to claims on some of the bonds on which the historical loss ratio has been calculated has a negligible effect of the reliability of the loss 42.1 percent loss ratio.  Still, in the interest of accounting for that fact, it is necessary to diminish, by a small measure, the estimate of Washington's lost profits.  The court concludes that if Ashton had remitted the premiums on the Standard bonds it later replaced, and if Washington were to pay all the claims made on those bonds, it would be left with about $50,000.  That lost profit constitutes Washington's damages for Ashton's breach of contract as to the Standard bonds.

**HTP bonds**.  The HTP bonds are a different story.  The problem with calculating Washington's losses vis à vis the HTP bonds is that Washington has been issuing those bonds only since 2007, which means that the time for filing claims against many of those bonds, if not all of them, has yet to expire.  Because it appears that Washington remains exposed to claims on a large proportion of the HTP bonds it has issued, any loss ratio calculated on the basis of Washington's current actual losses on those bonds is likely to significantly underestimate its

ultimate losses and overestimate its ultimate profits on those bonds.  Thus, the 22.4 percent loss ratio to which Hull testified in her affidavit does not provide a reliable basis for calculating the damages that resulted from Ashton's failure to remit premiums on HTP bonds.

Still, Ashton breached its agreement to remit $862,344 in premiums for the HTP bonds, and it cannot be doubted that Washington was damaged by that breach of contract.  Washington was exposed to claims on those bonds from May 1, 2010, through September 30 of that year.  During that time, it never had the benefit of a single dollar of the premiums that purchasers had paid Ashton for those bonds.  Between May 1 and July 15, Washington had Ashton's promise to remit those premiums, but after July 15, it did not even have that.  Yet, had a claim been made, Washington would have been obligated to pay it.  Thus, it was harmed to the extent that it needed to marshal the financial resources necessary to pay out of its own pocket any claims that might be made on the bonds it issued. Based upon the evidence before the court, Washington's reasonably ascertainable damages with respect to the HTP bonds are $59,885.  That figure is based upon the following.  Had Ashton not replaced the HTP bonds for which it did not remit the premiums, Washington would have been exposed to claims for a total of seventy-two months, the twelve months of the bond term plus another sixty months, based upon

the limitation period for some of the statutory violations that can give rise to claims on a bond.  Ashton's actions left Washington on the risk and without premiums for five months.[4] Five divided by seventy-two, times the amount of net premiums due on the HTP bonds, i.e., $862,344, equals $59,885.  As to the HTP bonds, no greater an award than that is supported by the record.

### Conclusion

For the reasons and to the extent described above, Washington's motion for summary judgment, document no. 82, Ashton's motion to strike, document no. 83, and Ashton's cross-motion for summary judgment, document no. 86, are all granted in part and denied in part.  Specifically, Washington is entitled to judgment in the amount of $592,084.33, which represents a recovery of $482,199.33 for Ashton's failure to remit premiums for the bonds it never replaced, $50,000 for Ashton's failure to remit premiums for the Standard bonds it replaced, and $59,885 for Ashton's failure to remit premiums for the HTP bonds it

---

[4] While the parties' agreement contemplated that Washington could be on the risk and without premiums from May 1 through July 15, their agreement to that possibility was based on premiums being remitted on July 15, which they were not.  Thus, on the facts of this case, leaving Washington without premiums between May 1 and July 15 was just as harmful as leaving it without premiums from July 15 through September 30.

replaced.  The clerk of the court is directed to enter judgment in accordance with this order and close the case.

   SO ORDERED.

   _____
   Landya McCafferty
   United States Magistrate Judge

March 7, 2013

cc:   Bradford R. Carver, Esq.
      Geoffrey M. Coan, Esq.
      Eric H. Loeffler, Esq.
      Jeffrey C. Spear, Esq.